The plaintiff tenant has instituted this action against the defendant landlord, under the authority of section 205(e) of the Emergency Price Control Act of 1942 (56 Stat. 23; U.S. Code, tit. 50, Appendix, § 901 et seq.). The litigation finds its source in alleged excess rentals paid by the plaintiff to the defendant for residential quarters in Milford, Connecticut, which town is concededly within a defense rental area established pursuant to the terms of the Act.
The Emergency Price Control Act of 1942 became effective on January 30, 1942. However, section 205(e) of this Act (U.S. Code, tit. 50, Appendix § 925 [e]) did not become operative until July 30, 1942. Section 205(e) provides: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. For the purposes ofthis section the payment or receipt of rent for defense-areahousing accommodations shall be deemed the buying or sellingof a commodity, as the case may be. If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States. Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent is paid. The provisions of this subsection shall not take effect until after the expiration of six months from the date of enactment of this Act." (Italics added.)
A landlord-tenant relationship has existed between the plaintiff and the defendant since 1938 with the tenancy, at all times, on a month-to-month basis.
On April 1, 1941, the plaintiff, in consideration of the tenancy for that month, paid the defendant a rental charge *Page 228 
of $20. This date is significant since the price ceiling for rents in the defense rental area in question was fixed as of April 1, 1941. Thereafter, however, the plaintiff's monthly rental was increased to $25, on the personal demand of the defendant, and this amount was paid regularly during the controversial months of July, August, September, October, November and December, 1942, as well as January, 1943. Thus, the plaintiff asserts that since he paid $5 per month in excess of the amount paid on April 1, 1941, during the seven months in controversy, he is entitled to recover $50 for each violation, together with reasonable counsel fees and costs of suit.
Since section 205(e) was inoperative in the month of July, 1942 (its effective date, as previously indicated, being July 30, 1942) the plaintiff, if he is permitted to recover, must be confined, as to the month of July, to a mere refund of his excess payment, namely, $5. For the remaining six months, however, the plaintiff, if permitted to recover, will be entitled to enforce the provisions of section 205(e), which permit him to seek $50 for each violation, or an aggregate of $300.
To the plaintiff's complaint, the defendant has filed special defenses, a counterclaim, and, at trial, offered what he regards as a plausible and valid explanation or justification of the payment of $25 during each of the controversial months. Succinctly stated, the defendant's contention is that in the early fall of 1940, at the plaintiff's request, he agreed to make extensive repairs to the exterior of the leased premises; that the plaintiff, in consideration of the repairs, agreed to increase his monthly rental payments to $25 upon completion of the work; that the repairs had been satisfactorily made by late October, 1940; that the plaintiff, in paying his November, 1940, rent, reneged, pleading an inability to pay additional rent during the winter, agreeing, however, to increase his monthly payments to $25 with the arrival of spring; that the defendant, in the spirit of an understanding landlord, waived his right to collect $25 a month through the winter months; that the collection of rents, during the period in question, was entrusted to an agent of the defendant; that the defendant's agent, with the coming of spring, neglected to notify the defendant of the plaintiff's failure to increase his monthly payments to $25; that this unhappy state of affairs did not come *Page 229 
to his attention until May, 1941; and that as of June 1, 1941, he enforced his agreement, causing the plaintiff to begin to pay $25 a month. This amount was paid each month thereafter, and its payment ultimately precipitated this controversy.
Thus, if I understand the defendant's position correctly, it may be stated in this fashion:
1. My present plight stems from my unwillingness to press the plaintiff for the payment of $25 a month upon completion of the remodeling of the leased premises;
2. Had I insisted on my rights, the plaintiff would have paid $25 a month for many months prior to April 1, 1941, and would have been obligated to pay $25 for the month of April, 1941;
3. Had this situation existed, then the rent for the leased premises would have been fixed at $25 per month on April 1, 1941, thus allowing me to continue to charge this sum thereafter without running counter to the Emergency Price Control Act of 1942.
The tale is ingenious but incredible. I am unable and unwilling to find that the plaintiff agreed to pay an increased rental in consideration of very minor repairs. Likewise, it is difficult to credit the account of the defendant's waiver of the increased rental from November 1, 1940 to June 1, 1941. I am thoroughly convinced that had the defendant been entitled to $25 a month for each of those months, he most assuredly would have enforced his claim. Particularly striking evidence of the defendant's bad faith is his involvement in a number of similar situations with other properties and other tenants. While an attempt has been made to rationalize all his difficulties, including the plaintiff's claim, I am forced to conclude that his conduct has been characterized by a continuing defiance of regulation in his effort to secure enhanced income from rent-producing properties. The plaintiff is justified in seeking a recovery.
Apart from the factual situation, the defendant claims that this court is without jurisdiction to entertain an action for recovery under the provisions of section 205(e) of the Emergency Price Control Act of 1942, contending that a State court is without power to enforce rights and remedies created by an act of Congress. This contention was ably and painstakingly *Page 230 
explored by Bordon, J. in the matter of Lapinski vs.Copacino, 12 Conn. Sup. 84. The sound reasoning therein supports a conclusion contra to the one for which the defendant now contends. And it should be added that the powerful force of judicial interpretation, coursing through virtually every state, supports the theory that state courts not only can, but must enforce rights and remedies created by an act of Congress.
The decision of Lapinski vs. Copacino, supra, appears to assume, without deciding, that an action under section 205(e) is penal rather than remedial in character, for therein appears the following language (p. 85): "The more serious and important question for adjudication is whether this court [Court of Common Pleas of the State of Connecticut] may, or can, take jurisdiction over rights and remedies created by an act of Congress, especially when they involve the enforcement of punitive remedies which are, in fact, penalties forviolation of a federal Law." (Italics added.)
It would seem to be preferable to regard section 205(e) as furnishing the basis for a remedial action rather than one penal in character. This distinction between actions penal and actions remedial was sharply made in Huntington vs.Attrill, 146 U.S. 657, 667, in this fashion: "Penal laws, strictly and properly, are those imposing punishment for an offence committed against the State, and which, by the English and American Constitutions, the executive of the State has the power to pardon. Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal."
And at pages 673-674: "The question whether a statute of one State, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another State, depends upon the question whether its purpose is to punish an offence against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act."
Applying the standard thus formulated, it becomes obvious that this action is not penal in its nature but one conferred for the purpose of affording a remedy at law to persons who have been called upon to pay unlawfully high prices or rental charges. *Page 231 
The holding of Huntington vs. Attrill, supra, is not an isolated piece of judicial interpretation. Rather, it has come to be regarded as a controlling precedent. In Whitman vs.Oxford National Bank, 176 U.S. 559, a statute which imposed a double liability upon shareholders of a corporation was held to be remedial and not penal in character. Likewise, in ChattanoogaFoundry and Pipe Works vs. City of Atlanta,203 U.S. 390, a treble damage action authorized by the Sherman Act and extended to those injured by conspiracies and monopolies prohibited thereby, was said to be non-penal. Similarly, actions by employees for the recovery of double damages, under the Fair Labor Standards Act of 1938, have been held to be remedial in the recent decision OvernightMotor Transportation Co., Inc. vs. Missel, 316 U.S. 572.
Provisions similar to section 205(e) are being used rather widely in acts of Congress and have been fortified by judicial sanction of the Supreme Court of the United States. "There are treble damage provisions in the United States patent laws; the United States trademark laws; the Sherman Anti-Trust Act; the Clayton Act; and the anti-dumping provisions of the Revenue Act of 1916. A Federal statute relating to seamen allows recovery of a sum equal to two days' pay for each day on which wage payments are delayed beyond the statutory time limit (46 U.S.C. § 596). And Fair Labor Standards Act provides for the recovery of double the statutory under-payment where wages in an amount less than the prescribed minimum have been paid (29 U.S.C. § 201)." Pratt vs.Hollenbeck (Court of Common Pleas, Erie County, Pa., April 22, 1943). Each of these provisions has been construed to be remedial rather than penal. Similarly, section 205(e) should be regarded in like fashion.
 On the complaint, judgment may enter for the plaintiff to recover of the defendant $305, together with a reasonable attorney's fee in the sum of $100, in addition to taxable costs.
Judgment may also enter for the plaintiff on the defendant's crosscomplaint.